**Dorothy HARVEY, Plaintiff,**

v.

**ALAMEDA COUNTY MEDICAL CENTER, et al., Defendants**

**No. C 02–1382 MMC.**

United States District Court, N.D. California.

Aug. 25, 2003.

Rose Kwiatkowski, Deputy County Counsel, Oakland, CA, Gregory James Rockwell, Boornazian Jensen & Garthe, Oakland, CA, Clyde A. Thompson, Strickland Haapala Altura, Oakland, CA, for Alameda County Medical Center.

Gregory J. Rockwell, Boornazian Jensen & Garthe, Oakland, CA, Oakland, CA, for Milton Lorig.

Stephanie M. Wells, William R. Hopkins, Wells & Hopkins, San Francisco, CA, for Dorothy Harvey.

Rose Kwiatkowski, Deputy County Counsel, Oakland, CA, Clyde A. Thompson, Strickland Haapala Altura, Oakland, CA, for Alameda Sheriff's Dept.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS ACMC AND LORIG; ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT ALAMEDA COUNTY; REMANDING STATE LAW CLAIMS

CHESNEY, District Judge.

Before the Court are two motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, filed, respectively, by the County of Alameda ("County"), sued herein as the Alameda

Sheriff's Department, and by the Alameda County Medical Center ("ACMC") and Milton Lorig, M.D. ("Dr.Lorig"). Plaintiff Dorothy Harvey ("Harvey") has filed oppositions, to which defendants have replied. Having considered the papers filed in support of and in opposition to the motions, the Court rules as follows.[1]

## BACKGROUND [2]

On May 16, 2001, Harvey, accompanied by her mother Luretha Harvey, went to Highland General Hospital ("Highland") to seek treatment for chest pain. (Harvey Dep. at 41, 49–50;[3] Luretha Harvey Dep. at 13–15.[4]) Highland is part of ACMC, a "public hospital authority." (Simon Decl. at 2.) Harvey went to the emergency room area and advised a triage nurse that she felt she was having a heart attack because she was experiencing chest pains, shortness of breath, and a rapid heart beat. (Harvey Dep. at 50–51, 58.) After Harvey requested a wheelchair, the triage nurse provided one. (Harvey Dep. at 60.) The triage nurse put a hospital bracelet on Harvey's wrist and directed Harvey to the registration desk. (Harvey Dep. at 60–61.) The triage nurse then pushed Harvey, who was in the wheelchair, to the registration desk. (Harvey Dep. at 62, 160.)

At the registration desk, Harvey gave a man at the desk her identification and health insurance information, and Harvey's mother advised the man of Harvey's symptoms. (Harvey Dep. at 62–66.) The triage nurse remained next to Harvey while Harvey was at the registration desk. (Harvey Dep. at 161.) Harvey was registered at 5:49 a.m. (Wells Decl. Ex. 8 at 9.) When the man at the registration desk stated that he had completed registering Harvey, the triage nurse told Harvey to wait in the waiting room. (Harvey Dep. at 66, 163.) Harvey responded, more than once, by saying that she could not go to the waiting room because she felt like she was having a heart attack. (Harvey Dep. at 69–70.) Harvey also asked for oxygen four or five times, but received no response other than "wait until your turn." (Luretha Harvey Dep. at 19–20.) The triage nurse told Harvey "in a mean way" that if Harvey did not go to the waiting area, the triage nurse would get the sheriffs and have them escort Harvey out. (Harvey Dep. at 69, 164.) Harvey replied that she did not care. (Harvey Dep. at 167.) The triage nurse then walked away. (Harvey Dep. at 168.) During this encounter with the triage nurse, Harvey, afraid that she was having a heart attack, raised her voice and may have been yelling. (Harvey Dep. at 69–70.)

Deputy Sheriff Jason Arbuckle ("Deputy Arbuckle") and Deputy Asha Jones Perez ("Deputy Perez") were advised by hospital staff of a disturbance in the triage area. (Arbuckle Dep. at 34, 71–72;[5] Perez Dep. at 14–15.[6]) When the triage nurse re-

---

1. By order filed July 14, 2003, the Court vacated the hearing on the motions scheduled for August 8, 2003.

2. The following facts are stated in the light most favorable to Harvey.

3. Excerpts from the Harvey deposition are attached as Exhibit 9 to the Declaration of Stephine M. Wells, filed July 8, 2003, and as Exhibit E to the Declaration of Gregory J. Rockwell, filed June 13, 2003.

4. Excerpts from the Luretha Harvey deposition are attached as Exhibit 14 to the Declaration of Stephine M. Wells, filed July 8, 2003.

5. Excerpts from the Arbuckle deposition are attached as Exhibit 2 to the Declaration of Stephine M. Wells, filed July 8, 2003, and as Exhibit F to the Declaration of Gregory J. Rockwell, filed June 13, 2003.

6. Excerpts from the Perez deposition are attached as Exhibit 5 to the Declaration of Stephine M. Wells, filed July 8, 2003, as Ex-

turned with the sheriffs, Harvey was still in the wheelchair near the registration desk. (Harvey Dep. at 89, 169–70.) A male nurse, "Tony," was also in the area. (Arbuckle Dep. at 67–68.) At that time, Harvey was not yelling. (Harvey Dep. at 89.) Harvey, who remained frightened that she was having a heart attack and was intimidated by the sheriffs, told the sheriffs she was a "heart patient" and that she felt she was having a heart attack. (Harvey Dep. at 89.) Harvey's mother was crying and telling the sheriffs that Harvey was a heart patient. (Harvey Dep. at 96.) Someone pushed Harvey's mother out of the area. (Harvey Dep. at 96.) Deputy Arbuckle left the area and spoke with Harvey's mother, who at that time was near the lobby. (Arbuckle Dep. at 70–73.)

Deputy Perez told Harvey to go to the public waiting area. (Harvey Dep. at 90.) After Harvey told Perez she would not leave because she felt she was having a heart attack, Perez approached, but did not touch, Harvey. (Harvey Dep. at 90–92.) Harvey, still in the wheelchair, then swung her purse at Perez. (Harvey Dep. at 91.)[7] The purse hit Perez around her chest area. (Harvey Dep. at 93.) Perez immediately ran to Harvey, grabbed her by the hair and threw her on the ground. (Harvey Dep. at 93.)

As Harvey was being pulled out the wheelchair, someone slammed her face to the ground, causing a bridge in her mouth to break and fall out. (Harvey Dep. at 113, 115.) At that time, Harvey was on the floor, face down. (Harvey Dep. at 96.) Harvey said "please don't treat me like this. I feel like I'm—— I'm a heart patient." (Harvey Dep. at 95.) One person,

and possibly others, put their knees in Harvey's back. (Harvey Dep. at 111.) While Harvey was on the ground, someone slammed her face into the floor. (Harvey Dep. at 111.)

Deputy Arbuckle returned to the scene, saw Harvey on the ground, and then handcuffed Harvey's hands behind her back. (Arbuckle Dep. 75, 78; Harvey Dep. at 97, 98, 101.) Harvey did not resist him or anyone else. (Harvey Dep. at 99; Arbuckle Dep. at 88.) As Harvey was being handcuffed, Deputy Perez told Deputy Arbuckle that she was not going to arrest Harvey but "was going to 5150 her."[8] (Perez Dep. at 47.) Deputy Perez then advised "Tony," the nurse who was present, of her decision. (Perez Dep. at 49.)

"More than one deputy" then pulled Harvey up to a sitting position, and one "deputy" pushed Harvey's head downward, causing Harvey to gasp for breath. (Harvey Dep. at 99–101.) After Harvey had been pulled up to a sitting position, a "doctor" came and injected Harvey with Haldol. (Harvey Dep. at 101.) Harvey was then put on a gurney. (Arbuckle Dep. at 91.) Another deputy, Deputy Hayes, arrived as Harvey was being placed on the gurney. (Arbuckle Dep. at 91.) Harvey was then taken on the gurney to the emergency room. (Arbuckle Dep. at 96, 98.) In the emergency room, Harvey was strapped to the gurney and Deputy Arbuckle removed the handcuffs. (Arbuckle Dep. 92, 98; Harvey Dep. at 101.) Harvey did not resist. (Arbuckle Dep. at 98.) None of the "deputies" advised Harvey of her rights or that she was going to be evaluated. (Harvey Dep. at 104.)

hibit G to the Declaration of Gregory J. Rockwell, filed June 13, 2003.

7. In Harvey's words, "I was having a heart attack, and would no one listen to me, so I threw the purse." (Harvey Dep. at 92.)

8. Perez's reference is to § 5150 of the California Welfare & Institutions Code, discussed in more detail below.

Deputy Perez went to her office to fill out a "5150 report." (Perez Dep. at 52.) On a form titled Application for Emergency Psychiatric Detention, Perez, in response to the question "What situation had developed prompting request for help from police/medical staff?," wrote "violent, combative, pressured speech, paranoid behavior." (Perez Dep. at 55–56; Wells Decl. Ex. 6.) In response to the question "What situation developed after police/medical staff intervention prompting decision to request emergency psychiatric detention?," Perez wrote "subject became physically aggressive to the point of violence." (Wells Decl. Ex. 6.) Perez also checked a box indicating her belief, based on probable cause, that Harvey had a "mental disorder," but did not complete other portions of the form. (Perez Dep. at 63; Wells Decl. Ex. 6.) At some point, Deputy Hayes completed a portion of the form that included questions concerning whether an advisement of rights had been given to the detained person. (Perez Dep. at 68.) In that portion of the form, Deputy Hayes checked a box indicating "Advisement incomplete," and, in response to a request to provide "[g]ood cause for incomplete advisement," Deputy Hayes wrote "still combative." (Perez Dep. at 68; Wells Decl. Ex. 6.)

If a peace officer detains a Highland patient pursuant to § 5150, the patient receives any necessary medical treatment before being cleared medically for transportation to a psychiatric evaluation facility. (Simon Decl. at 2–3.) The physician or physician's aide responsible for the medical treatment obtains a psychiatric consultation; the psychiatrist determines whether the § 5150 detention should continue. (Simon Decl. at 3.)

Kevin Binder ("Binder"), a physician's aide, evaluated Harvey's physical condition and ordered tests and medications for treatment of her symptoms. (Wells Decl. Ex. 11 at 3.) Binder evaluated Harvey for cardiac ischemia. (Binder Dep. at 42.) [9] The evaluation consisted of "two sets of iso enzymes and an EKG and a physical exam and history taking." (Binder Dep. at 42.) [10] Binder also ordered five blood tests, including a "complete metabolic panel," and a urine test. (Binder Dep. at 80–81, 83; Wells Decl. Ex 8 at 13.)

At 7:55 a.m., Binder ordered for Harvey a combination of five milligrams of Haldol, two milligrams of Ativan, and one milligram of Cogentin, all of which medications are used for sedation, as well as aspirin, and ordered that a catheter be inserted into Harvey's skin for purposes of taking a blood sample and potentially administering medicines. (Binder Dep. at 49–50, 77, 94; Harvey Dep. at 99, 101.) At 8:10 a.m., Harvey's mother asked Binder to transfer Harvey to Alta Bates Hospital, but Binder denied the request because Harvey was on a § 5150 hold. (Binder Dep. at 89, 91.) At 8:55 a.m., Binder ordered one milligram of Ativan for Harvey, and at 9:50 a.m., Binder ordered two milligrams of Ativan for Harvey. (Binder Dep. at 55, 94.) The medications that Binder ordered were given to Harvey either by Binder or by nurses. (Binder Dep. at 98.)

When a nurse was about to give Harvey an injection, a male deputy sheriff put his hand on Harvey's neck and choked her, cutting off "all oxygen supplies." (Harvey Dep. at 108.) Because Harvey could not

---

**9.** Excerpts from the Binder deposition are attached as Exhibit 7 to the Declaration of Stephine M. Wells, filed July 8, 2003, and as Exhibit H to the Declaration of Gregory J. Rockwell, filed June 13, 2003.

**10.** "History taking" involves interviewing the patient. (Binder Dep. at 42.)

breathe, Harvey "gave them [her] arm, [and] let them give [her] a shot." (Harvey Dep. at 108.) The male deputy kept his hands on Harvey's throat just long enough for the nurse to give Harvey the injection. (Harvey Dep. at 108.)

Binder diagnosed Harvey with "acute chest pain" and "acute anxiety." (Wells Decl. Ex. 8 at 13; Binder Dep. at 104–05.) Chere Hargis, M.D. ("Dr. Hargis"), an attending physician at Highland, reviewed the care provided by Binder and agreed with the treatment given, including the administration of sedatives. (Binder Dep. at 53–55; Wells Decl. Ex. 8 at 14.) Sometime during the afternoon, Binder called Milton Lorig, M.D. ("Dr.Lorig"), the staff psychiatrist at Highland, to advise Dr. Lorig that Harvey required psychiatric evaluation. (Lorig Decl. at 2; Binder Dep. at 90.) Around 1:30 p.m. or 2:00 p.m., Dr. Lorig began a "consultation evaluation" of Harvey to determine whether the "5150 could be dropped." (Lorig Dep. at 10–11.) [11] At approximately 2:30 p.m., after completing his evaluation, Dr. Lorig concluded, "This patient was anxious and agitated earlier but is now sedate and not in need of a 5150 hold." (Lorig Dep. at 30; Wells Decl. Ex. 8 at 2–3.) Dr. Lorig also recommended that Harvey be discharged once the "medical emergency room" decided she was "medically stable for discharge." (Lorig Dep. at 32.) Dr. Lorig did not prescribe any medications or treatment for Harvey. (Lorig Dep. at 35; Lorig Decl. at 2.)

Later, Binder determined that Harvey was ready to be discharged from Highland. (Binder Dep. at 86.) At 4:33 p.m., Harvey was discharged. (Wells Decl. Ex. 8 at 9.)

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The Supreme Court's 1986 "trilogy" of *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Rule 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). When determining whether there is a genuine issue for trial, "'inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.'" *See*

---

**11.** Excerpts from Dr. Lorig's deposition are attached as Exhibit 10 to the Declaration of Stephine M. Wells, filed July 1, 2003.

*Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

## DISCUSSION

Harvey alleges three causes of action in her First Amended Complaint ("FAC"). The First Cause of Action alleges a claim against all three defendants for violation of 42 U.S.C. §§ 1983, 1985 and 1986. The Second Cause of Action alleges a claim for violation of the Lanterman–Petris–Short Act ("LPS Act"), California Welfare and Institutions Code §§ 5000–5550, against the County only, and the Third Cause of Action alleges a claim against the County for intentional infliction of emotional distress.

### A. First Cause of Action

In the First Cause of Action, Harvey alleges that employees of the County and employees of ACMC, including Dr. Lorig, violated, and conspired to violate, her Fourth Amendment rights to be free from unreasonable seizures and unreasonable uses of force.

#### 1. Claims Against the County

Harvey alleges that deputy sheriffs, employees of the County, lacked probable cause to take her into custody under § 5150 and used excessive force against her. Harvey further alleges that such acts were taken pursuant to County policies, customs, patterns or practices.

 A local government entity can be held liable under 42 U.S.C. § 1983 for actions that result in the deprivation of a plaintiff's federal constitutional rights. *See Monell v. Dep't of Social Servs.,* 436

U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The government entity, however, cannot be held liable on a respondeat superior theory. *See id.* at 691, 98 S.Ct. 2018. Rather, the plaintiff must show that the employee's unconstitutional activity was "undertaken pursuant to official policy or custom." *See Hopper v. City of Pasco,* 241 F.3d 1067, 1082 (9th Cir.) (citing *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018), *cert. denied,* 534 U.S. 951, 122 S.Ct. 346, 151 L.Ed.2d 261 (2001). A plaintiff may establish a policy or custom, within the meaning of *Monell,* in three ways:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal government policy or a longstanding practice or custom which constitutes the standard operating procedure of the local government entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official government policy. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Id.* at 1083 (internal quotations and citations omitted).

Harvey argues that deputy sheriffs committed the alleged constitutional violations pursuant to formal County policies or longstanding County practices.[12]

#### a. Seizure under § 5150

 It is undisputed that Deputy Perez made the decision to take Harvey into custody pursuant to § 5150.[13]

---

**12.** Harvey does not argue that the deputy sheriffs were officials with final policy-making authority or that the actions of the deputy sheriffs were ratified by an official with final policy-making authority.

**13.** Although, as noted, Harvey alleges that the decision to detain her pursuant to § 5150 was the product of a conspiracy, Harvey does not argue in her opposition that she has evidence to support a conspiracy claim.

Section 5150 provides that "[w]hen any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer [or other designated persons] may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72–hour treatment and evaluation." *See* Cal. Welf. & Inst.Code § 5150. The lawfulness of a detention under § 5150 is measured by Fourth Amendment standards. *See Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir.1991) (holding seizure of suspected mentally ill person for psychiatric evaluation is "analogous to a criminal arrest and must therefore be supported by probable cause"); *People v. Triplett*, 144 Cal.App.3d 283, 287, 192 Cal.Rptr. 537 (1983) (holding officer did not violate Fourth Amendment by taking defendant into custody under § 5150 where it was reasonable to infer from facts known to detaining officer that plaintiff was "at least temporarily disordered" and "as a result of mental disorder was a danger to herself").

The County does not, for purposes of the instant motion, assert that Harvey lacks evidence to support a finding that Perez deprived Harvey of her Fourth Amendment rights with respect to the seizure. Rather, the County argues that Harvey lacks evidence to support a finding that any such deprivation was undertaken pursuant to a County policy or custom.

The County relies on the Sheriff's Office's written "Policy and Procedure" concerning "emergency psychiatric detention" of persons at ACMC. The policy is described as follows: "It is the policy of the Alameda County Sheriff's Office to attempt to protect the safety of persons who, as a result of a suspected mental illness, may attempt to harm themselves or others. It is also the policy of the Sheriff's Office to attempt to protect persons from harm as a result of their own inability to care for their basic personal needs of food, clothing and shelter." (*See* Masterson Decl. Ex. 4.) The document also sets forth the following procedure for deputies to follow: "Whenever a deputy encounters or contacts a person at the hospital who, in the opinion of the deputy, is gravely disabled, or represents a threat to their own safety or the safety of others, or when asked to place a 5150 hold on a patient by the attending physician or the charge nurse, the deputy will make his/her own evaluation, and then the deputy shall cause the person to be detained for psychiatric evaluation." (*See id.*) If the deputy decides to detain the person under § 5150, the deputy is instructed to complete an "Application for Emergency Psychiatric Detention" form at the scene, to retain a copy as the incident report, and to give copies to the charge nurse "so that the papers will accompany the subject to the Psychiatric Detention Facility." (*See id.*)

The County also relies on written training materials used in the training of deputies with respect to emergency psychiatric detentions under § 5150. (*See* Bond Decl. Ex. 6) Such materials include examples of situations in which a detention under § 5150 would, or would not, be appropriate, (*see id.* at 1–21 to 1–23), and behavioral indicators that may evidence mental disorder. (*See id.* at 2–3 to 2–7.)

Harvey argues that the above-referenced written materials are deficient and/or that the County has other policies that were followed in instituting the detention at issue herein. The Court addresses each of Harvey's arguments in turn.

**(1) Probable Cause re: Mental Disorder**

Harvey argues that the written training materials on which the County relies evi-

dence an unconstitutional policy because those materials instruct deputies to detain under § 5150, irrespective of whether there is probable cause to believe the detainee has a mental disorder. In support thereof, Harvey relies on a page from the training materials, setting forth the following probable cause standard for a § 5150 detention: "The officer must: be able to state known facts, that would lead a person of ordinary care and prudence to believe or to entertain a strong suspicion that the person detained is a danger to self, or gravely disabled." (*See id.* at 1–18.) Harvey also points to a quiz contained in the training materials, in which a question is posed as to what constitutes probable cause to detain under § 5150, and the proper response is "specific facts that would lead a person of ordinary care to believe that the person has attempted to harm oneself, another person, or is gravely disabled." (*See id.* at Q–8.) The deficiency in these materials, according to Harvey, is that they do not require the deputy to have probable cause to believe the detained person has "a mental disorder." *See* Cal. Welf. & Inst.Code § 5150 ("When any person, as a result of a mental disorder, is a danger to others . . . .")

The Supreme Court has held that a local government entity's failure to adequately train can constitute a "policy" for *Monell* purposes where "the failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *See City of Canton v. Harris*, 489 U.S. 378, 389, 390 n. 10, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (observing that because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," a city's failure to train officers on the use of deadly force in such situations "could properly be characterized as 'deliberate indifference' to constitutional rights").

Here, Harvey relies on two passages from training materials comprising over 200 pages. Although the two passages, when read in isolation, are arguably incomplete in their description of probable cause, the training materials as a whole teach that a detention under § 5150 is appropriate only where the detainee appears to have a mental disorder. For example, the training materials state that "[i]f the officer determines that the person appears to be affected by a mental disorder," the officer should then consider whether detention under § 5150 is appropriate. (*See* Bond Decl. Ex. 6 at 2–24.) Many similar passages are included in the training materials. (*See, e.g., id.* at 1–13, 1–36 (referring to "mental disorder" requirement set forth in § 5150); *id.* at 1–14 (explaining "person's actions must be the result of a mental disorder and not merely the result of a lifestyle or attitude choice, including substance induced intoxication"); *id.* at 2–1 (stating "peace officers must become familiar with the causes and nature of mental disorders in order to determine if an individual is gravely disabled or dangerous"); *id.* at 2–22 (setting forth "indicators officers may use to help determine if persons who appear to be affected by a mental disorder are dangerous to themselves or others").) In short, the County's training materials do not evidence a County policy that deputy sheriffs may effectuate a § 5150 detention in the absence of probable cause to believe the detainee has a mental disorder.

Moreover, in the instant case, Deputy Perez completed an Application for Emergency Psychiatric Detention, and indicated thereon that she believed, "based on probable cause," that Harvey had a "mental disorder." (*See* Wells Decl. Ex. 6.) Irrespective of whether Perez was correct in her determination that such probable cause existed, there is no evidence suggesting Perez was unaware of the statuto-

ry requirement that a § 5150 detention requires probable cause to believe the detainee has a mental disorder.

Accordingly, the County is entitled to summary judgment on Harvey's claim that her detention was the result of a policy allowing deputies to detain individuals under § 5150 in the absence of probable cause to believe the detainee has a mental disorder.

## (2) Recognition of Mental Disorder

■ Harvey asserts that Perez's deposition testimony supports a finding that Perez did not have any training as to § 5150 detentions beyond initial academy training.[14] Harvey argues that had Perez been given additional training, Perez would have realized there was no probable cause to believe Harvey's behavior was the result of a mental disorder.

■ Where a plaintiff bases a *Monell* claim on the theory that the training provided on a specific subject is insufficient, the plaintiff cannot prevail by offering, without more, evidence that the government entity miscalculated the amount of time necessary to adequately prepare its employees. *See Mateyko v. Felix*, 924 F.2d 824, 826 (9th Cir.1990) (holding evidence police department trained officers for three to four hours in the use of Tazer guns, without more, was insufficient to establish *Monell* claim; noting "failure to provide a more lengthy training program suggests at most negligence on the part of [the employer] in miscalculating the amount of time necessary to adequately prepare its officers"), *cert. denied*, 502 U.S.

814, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991). Rather, the plaintiff must offer evidence indicating "the [employer] knew it was creating an unjustifiable risk to its citizenry and ignoring that risk." *See id.*

Here, as noted, the County's training materials include a list of behaviors that may indicate mental disorder. (*See* Bond Decl. Ex. 6 at 2–3 to 2–7.) Such indicators are included in 30–page chapter titled "Mental Disorders." (*See id.* at 2–1 to 2–30.) The stated objectives of that chapter include training deputies with respect to how the term "mental disorder" is defined, as well as how to "recognize behavioral cues that may be generally associated with persons affected by mental disorders." (*See id.* at 2–1.) In support of her argument that such training is insufficient, Harvey relies on the deposition of her expert, Stephen Odom ("Odom"), a supervisor with the Berkeley Police Department, who testified to his opinion that "as least for [deputies] that are assigned to the streets and the hospital, there is a need for more training," including training in being able to recognize "neurotic behavior or some situational stress that is not 5150."[15] (*See* Odom Dep. at 54–55.)[16] Odom's testimony, at best, suggests that the County should offer additional training on recognition of mental disorders. Such testimony, however, does not, by itself support a finding that the County knew its training on this subject was so deficient as to create an unjustifiable risk to citizens that they would be detained in violation of their Fourth Amendment rights. *See Mateyko*, 924 F.2d at 826.

---

**14.** Although Harvey fails to cite to any specific testimony to support such a finding, the County does not contest Harvey's interpretation of Perez's testimony.

**15.** Harvey has designated Odom as an expert, and has disclosed in discovery that "Odom will testify as to what situations call for a [ ] § 5150 detainment, and the training of the

officers concerning avoiding use of excessive force," as well as "correct training and procedures for take downs." (*See* ACMC and Lorig's Obj. Ex. A.)

**16.** Excerpts from the Odom deposition are attached as Exhibit 1 to the Declaration of Stephine M. Wells, filed July 8, 2003.

Accordingly, the County is entitled to summary judgment on Harvey's claim that her detention was the result of a policy of providing insufficient training on the subject of recognizing mental disorder.

### (3) Communication

■ Harvey argues that the County does not have a policy that "provide[s] sufficient procedures for sheriff's and medical staff to communicate to determine what kind of situation they are dealing with," (*see* Pl.'s Opp. to County's Mot. at 20); Harvey argues that the lack of such policy caused Deputy Perez to fail to articulate a valid basis for the § 5150 detention. In support of this argument, Harvey relies on the testimony of her expert, Odom, who offered the opinion that there was insufficient communication among the deputy sheriffs involved in the subject incident and between those deputy sheriffs and medical staff. (*See* Odom Dep. at 75–76.) Other than her expert's opinion as to the communication that occurred in the one incident involving Harvey, Harvey points to no evidence to support a finding that the County knew its training on the subject of communication created an unjustifiable risk to citizens and that the County ignored that risk. *See Mateyko,* 924 F.2d at 826. Indeed, Harvey offers no evidence concerning the County's training, or lack thereof, on this subject. Without more, Harvey cannot establish a policy based on evidence of a lack of communication between Deputy Perez and others present at the time Perez decided to detain Harvey. A plaintiff cannot establish the existence of a policy based on a single incident. *See Meehan v. County of Los Angeles,* 856 F.2d 102, 107 (9th Cir.1988) (holding evidence that county employees engaged in "unconstitutional assaults" on two occasions insufficient to support finding such assaults were pursuant to county policy).

Accordingly, the County is entitled to summary judgment on Harvey's claim that her detention was the result of a policy of providing insufficient training on the subject of communication skills.

### (4) Diversity

■ Harvey argues that the County does not train deputy sheriffs in "diversity issues, which include a recognition of the common cultural distinctions that come into play, particularly where questions of the use of force and/or detentions are involved." (*See* Pl.'s Opp. to County's Mot. at 25:10–16.) As a result, according to Harvey, Perez used excessive force and improperly detained Harvey. In particular, Harvey argues: "The erroneous and improper determination to use force (and in an excessive manner) and to detain was based, in pertinent part, on a failure to recognize[ ] the unique cultural expressions of an African American, and to also stereotype a large African American woman as being disturbed, rather than the reality of this simply being a female experiencing physical trauma." (*See id.* at 25:22–26:3). Harvey, however, offers no evidence to support a finding that the County does not provide training as to diversity issues, much less evidence that any such training is so deficient as to constitute deliberate indifference to the rights of any groups of citizens.

Accordingly, the County is entitled to summary judgment on Harvey's claim that her detention was the result of a policy of providing insufficient training on the subject of diversity.

### b. Use of Restraints

■ Harvey offers evidence that after Deputy Perez detained Harvey pursuant to § 5150, one or more deputy sheriffs assisted, or were otherwise involved with, ACMC employees in using restraints to

strap Harvey to a gurney at the time ACMC staff began treating Harvey in the Emergency Department. Harvey alleges that placing her in such restraints constituted an unreasonable seizure within the meaning of the Fourth Amendment.

The County argues that Harvey lacks evidence to support a finding that any such seizure, if unreasonable, was undertaken pursuant to a County policy or custom. The County relies on the written "Policy and Procedure" of the Sheriff's Office on "Restraining 5150 W & I patients and/or physically assaultive patients" at ACMC. (*See* Masterson Decl. Ex. 5.) The written policy, in relevant part, provides: "It is the policy of Highland [ ] Police Services to minimize the risk of injury to hospital staff, patients and Visitors by assisting the hospital staff in restraining uncooperative 5150 W & I and/or physically assaultive patients." (*See id.*) The policy provides, *inter alia,* that deputy sheriffs may assist ACMC staff in restraining a patient on a § 5150 hold when asked to do so by a medical doctor or registered nurse in an "emergency situation." (*See id.*) The policy defines an "emergency situation" as follows:

1. The patient's behavior or verbalizations indicate that physical danger exists, or,

2. The Patient's non-verbal cues or signals indicate that physical danger is imminent, or,

3. Documented history or experience has shown that a particular patient does not respond to less restrictive measures, and any further time delay would result in exposing the patient and others to physical harm.

(*See id.*)

Harvey offers no evidence suggesting the above-referenced policy is inadequate nor does she offer any other evidence as to the nature and extent of the training provided on the subject of restraints. Rather,

again relying on Odom's testimony, Harvey argues that the County has insufficiently trained its deputies in the subjects of communication skills and diversity. For the reasons discussed above, the opinion of Harvey's expert on these two subjects is insufficient to create a material issue of fact. *See Mateyko,* 924 F.2d at 826.

Accordingly, the County is entitled to summary judgment on Harvey's claim that deputies, acting pursuant to a County policy, restrained her in the hospital in violation of the Fourth Amendment.

### c. Use of Force

 Harvey has offered evidence that one or more deputy sheriffs grabbed Harvey by the hair and threw her to the ground; slammed her head on the ground with sufficient force to cause a bridge in her mouth to fall out; slammed her head on the ground a second time; kneed her in the back; handcuffed her; forcibly placed her on a gurney; and choked her while a nurse administered an injection.

The County does not, for purposes of the instant motion, assert that Harvey lacks evidence to support a finding that the force used was excessive under the circumstances. Rather, the County argues that Harvey lacks evidence to support a finding that any excessive force was undertaken pursuant to a County policy or custom. In that respect, the County relies both on Sheriff's Office General Order 1.05, titled Use of Force, which sets forth guidelines as to authorized uses of force, (*see* Masterson Decl. Ex. 2), and written training materials used to instruct deputy sheriffs in the subjects of use of force and controlling persons under arrest. (*See* Bond Decl. Exs. 7, 8.) The County also relies on the earlier-described policy and training materials specific to § 5150 detentions.

Harvey argues that the County's policy and training materials are insufficient because, according to Harvey, such materials fail to "express any form of guidance for officers to explore alternative methods" and fail to set forth "the level of dangerousness that an individual must exhibit before the officers are authorized to use force to detain an individual under 5150." (*See* Pl.'s Opp. to County's Mot. at 22.) In support of these contentions, Harvey relies on the testimony of her expert, Odom, who offered the opinion that the force used against Harvey was "excessive and unnecessary." (*See* Odom Dep. at 78.) Odom also observed that the deputy sheriffs failed to comply with written County policies directing deputies to complete a use-of-force form when force is used to effectuate a detention under § 5150. (*See* Odom Dep. at 77–78.) Harvey, however, offers no testimony by Odom, or anyone else, criticizing the County's written policies and training materials concerning use of force. Indeed, Odom testified that he did not review Sheriff's Office General Order 1.05. (*See* Odom Dep. at 98.) In short, while Odom's testimony may support a finding that one or more deputy sheriffs used excessive force and did not comply with County policies, Odom's testimony does not support a finding that any excessive force used by any such deputy sheriff was pursuant to a County policy.

Harvey also argues that the County's alleged failure to provide diversity training was a causal factor in the alleged use of excessive force. For the reasons discussed above, Harvey has failed to create a material issue of fact with respect to the existence of any County policy based on insufficient diversity training.

Accordingly, the County is entitled to summary judgment on Harvey's claim that a deputy sheriff or sheriffs, acting pursuant to a County policy, used excessive force against Harvey in violation of the Fourth Amendment.

## 2. Dr. Lorig

In the FAC, Harvey alleges that Dr. Lorig provided "aid, help and consent" to deputy sheriffs when they used excessive force on Harvey, (*see* FAC ¶ 41), and participated in a conspiracy to deprive Harvey of her rights. (*See* FAC ¶ 43.) Harvey also alleges that Dr. Lorig "deprived [Harvey] of her right to be free from harm, including unnecessary or excessive physical restraint, isolation, medication, abuse or neglect," and "resort[ed] to medication as not only a means of restraint, but also as a punitive measure." (*See* FAC ¶ 47.) Dr. Lorig argues that Harvey lacks evidence to support her claims against him.

Harvey offers no evidence that Dr. Lorig had any involvement in the application of force by deputy sheriffs or anyone else, or that he physically restrained or medicated her. Indeed, Harvey, in her opposition, does not even discuss her allegations that Dr. Lorig is liable based on the use of excessive force. Consequently, Harvey cannot base her claim against Dr. Lorig on such allegations.

Harvey argues that Dr. Lorig "never engaged in any measures to assure that Harvey ... was being detained in a manner consistent with the dictates of the statute [§ 5150]." (*See* Pl.'s Opp. to ACMC/Lorig Mot. at 17.) Harvey, however, offers no evidence to dispute Dr. Lorig's evidence that his only involvement with Harvey occurred after he was contacted by physician's aide Binder on the afternoon of May 16, 2001, that he performed a psychiatric evaluation of Harvey, and that based thereon, he determined there was no need to retain the § 5150 hold. In sum, Harvey offers no evidence to support a finding that Dr. Lorig failed

to determine whether Harvey was being detained in a manner consistent with § 5150, and, indeed, the undisputed evidence is to the contrary.

With respect to her claim that Dr. Lorig was involved in a conspiracy, Harvey argues that "Dr. Lorig clearly approved of the conduct, and took no measures to correct the unlawful manner in which 5150 detention are exceucted [sic]." (*See id.* at 29.) Harvey, however, offers no evidence that Dr. Lorig "approved" of Deputy Perez's detention. Rather, assuming, *arguendo*, Deputy Perez's decision to take Harvey into custody under § 5150 was unlawful, it is undisputed that Dr. Lorig, in effect, corrected that decision when he found no reason to continue the hold.

Accordingly, Dr. Lorig is entitled to summary judgment on Harvey's claim that he deprived her of her Fourth Amendment rights.

▆▆▆▆▆ Dr. Lorig also argues that Harvey lacks evidence to support a claim that he violated her right to equal protection.[17] To support a claim based on a violation of equal protection rights, "a plaintiff must demonstrate that the defendants acted with the intent to discriminate." *See Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1112–13 (9th Cir.1991). Harvey argues that her detention under § 5150 was on account of her race, but does not plead such a claim in her FAC. In any event, because it is undisputed that Dr. Lorig had no involvement in the decision to detain Harvey under § 5150 and, in fact, decided

that she should not be detained, Harvey cannot establish an equal protection claim against Dr. Lorig.

Accordingly, Dr. Lorig is entitled to summary judgment on any claim that he deprived Harvey of her right to equal protection.

### 3. ACMC

Harvey has presented evidence that ACMC employees used force to assist deputy sheriffs in taking Harvey into custody pursuant to § 5150; applied restraints to Harvey as she was being taken into the emergency room for medical treatment even though she was cooperative; injected Harvey with sedatives without her consent; denied a request to transfer Harvey to another hospital; and waited several hours after Harvey began to receive medical treatment to consult with Dr. Lorig about the propriety of the § 5150 hold.[18] Harvey alleges that such acts were unconstitutional and were taken pursuant to ACMC policies, customs, patterns or practices. ACMC asserts that Harvey lacks evidence to support a *Monell* claim based upon such acts.

### a. Use of Force to Assist Deputy Sheriffs

▆▆▆ Harvey offers evidence that ACMC employee "Tony," a nurse, used force on Harvey after Harvey swung her purse at Deputy Perez. Harvey, however, offers no evidence that the nurse was acting pursuant to an ACMC policy or prac-

---

**17.** Harvey does not expressly allege in the FAC that any defendant violated her right to equal protection. Both Dr. Lorig and ACMC, however, have discussed the merits of any such claim, to the extent Harvey is asserting one.

**18.** Because the Court has found that Harvey cannot prevail on her claim that Dr. Lorig deprived her of a federal right, the Court will

analyze the *Monell* claim against ACMC with reference to the actions of ACMC employees other than Dr. Lorig. *See Orin v. Barclay*, 272 F.3d 1207, 1217 (9th Cir.2001) (holding *Monell* claim "fails as a matter of law unless a city employee's conduct violates one of the plaintiff's federal rights"), *cert. denied*, 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002).

tice when he engaged in that conduct. Accordingly, assuming, *arguendo,* the nurse's conduct violated Harvey's constitutional rights, ACMC is entitled to summary judgment on Harvey's claim that an ACMC policy caused such deprivation.

#### b. 5150 Detention

■ ACMC argues that it cannot be liable on Harvey's claim that ACMC employees were involved in an improper detention under § 5150 because Deputy Perez made the decision to detain, and ACMC employees were not otherwise participants in the detention.

As noted, it is undisputed that before Deputy Perez made the decision to take Harvey into custody under § 5150, Harvey had been registered as a patient at Highland, and that such registration was preceded by Harvey's complaining of chest pains, shortness of breath, and a rapid heart beat. Following the detention by Deputy Perez, it is undisputed that ACMC staff, predominately physician's aide Binder, began treating Harvey in the Emergency Department for her medical complaints. It is further undisputed that during the afternoon, Binder determined that Harvey could be discharged from the hospital. Because Dr. Lorig, prior to Binder's decision to discharge Harvey, had decided Harvey did not need to be detained under § 5150, Harvey was never taken to a psychiatric treatment facility for treatment and evaluation under § 5150.

Harvey argues that ACMC employees, pursuant to an ACMC policy of deliberate indifference to the rights of § 5150 detainees treated at Highland, failed to provide her with the statutory rights available under the LPS Act. Harvey argues that such a policy of deliberate indifference to de-

tainees' rights under the LPS Act also constitutes deliberate indifference to detainees' rights under the Fourth Amendment.

ACMC relies on the declaration of Barry Simon, M.D., Chairman of Highland's Emergency Department, who describes ACMC's policy when a Highland patient is taken into custody by a deputy sheriff under § 5150. According to Dr. Simon, such a patient, if necessary, remains at Highland to receive treatment in the Emergency Department before any transportation to a psychiatric evaluation facility,[19] (*See* Simon Decl., filed June 13, 2003, at 2:20–3:2), and the physician or physician's aide responsible for the patient's care will obtain a psychiatric consultation to determine if the § 5150 hold should be continued after the patient is "treated and medically cleared." (*See* Simon Decl., filed June 30, 2003, at 3:4–9.)

Harvey correctly observes that Dr. Simon, in describing ACMC's policy, does not state that ACMC provides such § 5150 detainees with the statutory rights available to § 5150 detainees under the LPS Act. ACMC argues that hospitals providing emergency medical care to § 5150 detainees are not subject to the statutory requirements of the LPS Act, and therefore ACMC is not required to provide persons detained under § 5150 with the statutory rights set forth in the LPS Act.

Under the LPS Act, the detaining officer is directed to place the detainee in a "facility designated by the county and approved by the State Department of Mental Health as a facility for 72–hour treatment and evaluation." *See* Cal. Welf. & Inst. Code § 5150. The "facility for 72–hour treatment and evaluation" is subject to a number of requirements under the LPS

---

**19.** As explained by Dr. Simon, "Frequently such individuals have medical conditions, such as injuries, which require emergency medical care before they can be transported to a psychiatric evaluation facility." (*See* Simon Decl., filed June 13, 2003, at 2–3.)

Act, including, but not limited to, the following: (1) before the facility can admit a detainee, the facility must "determine the appropriateness of the involuntary detention," a procedure known as a "preadmission assessment," *see* Cal. Welf. & Inst. Code § 5151; (2) if the facility admits the detainee, the facility must provide the detainee with "an evaluation as soon after he or she is admitted as possible" and must provide "whatever treatment and care his or her condition requires for the full period that he or she is held," *see* Cal. Welf. & Inst.Code § 5152(a); (3) if the facility provides a detainee with medication as a result of the detainee's mental illness, the facility must provide "as soon as possible after detention, written and oral information about the probable effects and possible side effects of the medication," *see* Cal. Welf. & Inst.Code § 5152(c); and (4) the facility must give the detainee both orally and in writing certain specified information, such as the reason the detainee has been placed in the psychiatric unit and notice of the fact that the detainee may be held for a period of up to 72 hours. *See* Cal. Welf. & Inst.Code § 5157(c).

Harvey asserts that ACMC employees did not provide her with the above-referenced statutory rights, as well as other statutory rights, required under the LPS Act.[20] Assuming, *arguendo*, that a failure to comply with the statutory requirements of the LPS Act can support a Fourth Amendment claim, Harvey's evidence that ACMC employees did not comply with the LPS Act is immaterial in the absence of a showing that Harvey was admitted to Highland for treatment and evaluation un-

der § 5150, in other words, that Highland acted as a "facility designated by the county and approved by the State Department of Mental Health as a facility for 72–hour treatment and evaluation" subject to the provisions of the LPS Act. *See* Cal. Welf. & Inst.Code § 5150. Harvey offers no such evidence.[21]

Harvey also argues that Binder, the physician's aide, "involuntarily detained Harvey." (*See* Pl.'s Opp. to ACMC/Lorig Mot. at 19.) Although the factual basis for this argument is unclear, Harvey appears to rely on evidence that Binder denied a request, made by Harvey's mother, to "release" Harvey and allow Harvey to seek treatment at a different hospital. (*See id.* at 11.) It is undisputed, however, that until such time as Dr. Lorig removed the § 5150 hold, Harvey was being detained as a result of a decision by Deputy Perez. Harvey offers no evidence, nor even argues, that Binder had the authority to release the hold, i.e., to overrule Deputy Perez's decision. Thus, contrary to Harvey's argument, Binder did not violate Harvey's Fourth Amendment rights by advising Harvey's mother that he could not allow Harvey to leave Highland. At that point in time, the detention was wrongful, if at all, because of an erroneous decision by Deputy Perez.

In sum, because there is no evidence that ACMC employees were involved in the decision to detain Harvey under § 5150 and because there is no evidence to support a finding that Highland acted as a "facility for 72–hour treatment and evaluation," ACMC is entitled to summary

---

**20.** For example, Harvey offers evidence that no one at ACMC conducted a "preadmission assessment" and no one gave her the advisements and information required under the LPS Act.

**21.** Although a § 5150 detainee, after being medically discharged by Highland, ordinarily

would be taken to a "facility designated by the county and approved by the State Department of Mental Health as a facility for 72–hour treatment and evaluation," *see* Cal. Welf. & Inst.Code § 5150, that did not occur here because Dr. Lorig had removed Harvey's § 5150 hold before her discharge.

judgment on Harvey's claim that ACMC employees, acting pursuant to an ACMC policy, detained Harvey in violation of the Fourth Amendment.

### c. Use of Restraints

 Harvey offers evidence that while she was being treated in the Emergency Department, she was placed in restraints, even though she was not resisting and was cooperative. Harvey asserts that the decision to place her in restraints deprived her of her Fourth Amendment rights.

ACMC argues that ACMC does not have a policy allowing its employees to apply unnecessarily restrictive restraints. ACMC relies on the declaration of Dr. Simon, who states that the ACMC policy is to use physical restraints on "patients who are violent and uncooperative to the point of jeopardizing their own health and safety and/or that of others." (See Simon Decl., filed June 13, 2003, at 4.) Harvey does not contend that the policy described by Dr. Simon is unlawful; rather, Harvey argues that the Emergency Department's actual practice is to use restraints on all § 5150 detainees, even if the detainee is, as she contends she was, "calm, nonresistant and cooperative." (See Pl.'s Opp. to ACMC/Lorig's Mot. at 27.)

Harvey relies on the deposition testimony of Robert M. Rodriguez, M.D. ("Dr.Rodriguez"), an ACMC emergency department physician, and Leona Munar ("Munar"), an ACMC Patient Financial Counselor. Dr. Rodriguez testified that the number of patients with § 5150 holds who have not been restrained is "probably less than 5 percent." (See Rodriguez Dep.

at 28.)[22] Munar testified that she has observed patients in the Emergency Department, who were under a § 5150 hold, in restraints, including "a five-point hold."[23] (See Munar Dep. at 10–11.)[24] Neither witness provided testimony from which it could reasonably be inferred that ACMC employees, as a matter of policy or practice, place restraints on nonresistant and cooperative patients. Indeed, in the excerpts from Dr. Rodriguez's deposition testimony offered by Harvey, Dr. Rodriguez, when asked under what circumstances restraints are used, answered: "When there's danger of patients injuring themselves, patients injuring hospital staff— or those are the primary two I would say." (See Rodriguez Dep. at 25.) Consequently, Harvey offers insufficient evidence to create a material issue of fact as to the existence of such a policy or practice.

Accordingly, ACMC is entitled to summary judgment on Harvey's claim that she was restrained in violation of the Fourth Amendment pursuant to an ACMC policy or practice.

### d. Use of Sedatives

 It is undisputed that Binder, while providing treatment to Harvey, ordered that Harvey be given certain sedatives, including Haldol, and that this course of treatment was approved by ACMC employee Dr. Hargis. Harvey also offers evidence that an ACMC employee, identified by Harvey as a "doctor," administered Haldol immediately after deputy sheriffs lifted her from the floor and placed her in a sitting position. (See Harvey Dep. at

**22.** Excerpts from the Rodriguez deposition are attached as Exhibit 10 to the Declaration of Stephine M. Wells, filed July 8, 2003.

**23.** Munar described a "five point hold" as follows: "[T]heir wrists are restrained and then their legs are restrained and there is also

a belt restraint on their waist." (See Munar Dep. at 10.)

**24.** Excerpts from the Munar deposition are attached as Exhibit 3 to the Declaration of Stephine M. Wells, filed July 8, 2003.

101.) Additionally, Harvey has offered evidence that she did not consent to such treatment and was never given the opportunity to consent. Harvey argues that the use of such sedatives without her consent deprived her of her Fourth Amendment rights, and that such deprivation occurred pursuant to an ACMC policy.

In support of her argument, Harvey relies on the declaration of her expert, Humphrey Ogg ("Ogg"),[25] a registered nurse with "18 years of acute psychiatric emergency room experience in the evaluation and determination of [ ] 5150's," who offers the opinion that Haldol is a "psychotropic medication" and that such medication "usually require[s] consent unless it is given in an emergent situation (in other words life threatening)." (*See* Ogg Decl. ¶ 2, 24.) Harvey further asserts that ACMC has a policy whereby "medication is being used not only as a means of punishment, but it is also being used for the convenience of staff, as a substitute for treatment, and in quantities that interfere with any actual treatment of a mental disorder." (*See* Pl.'s Opp. to ACMC/Lorig's Mot. at 2.)

ACMC relies on the declaration of Dr. Simon, who describes ACMC's policy with respect to the use of sedatives. According to Dr. Simon, ACMC has a policy that such medications are only used when "medically appropriate and never as a 'punitive measure.'" (*See* Simon Decl., filed June 13, 2003, at 4.) Dr. Simon further states that the use of sedatives is, as with restraints, sometimes necessary when a patient is violent and uncooperative to the extent that the patient is jeopardizing her own health and safety or that of others.

(*See id.*) Harvey does not argue that the policy as described by Dr. Simon is unconstitutional. Rather, as noted, she asserts that ACMC has, in practice, a different policy.

Even if Ogg's testimony can be read as stating an opinion that it is never medically appropriate to administer Haldol other than in an "emergent situation," Harvey has not shown that the policy described by Dr. Simon— allowing the administration of sedatives only when "medically appropriate"— is inconsistent with that opinion. Indeed, although Ogg opines that the use of sedatives in the instant case was inappropriate for particular medical reasons,[26] Ogg does not purport to offer an opinion concerning the existence, or propriety, of any policy on the part of ACMC concerning the use of sedatives, let alone with or without consent.

Accordingly, ACMC is entitled to summary judgment on Harvey's claim that she was given sedatives in violation of the Fourth Amendment pursuant to an ACMC policy or practice.

## B. Second and Third Causes of Action

The Court has granted summary judgment on Harvey's First Cause of Action, the only federal claim in the FAC. The Court's jurisdiction over the instant action is based on the existence of a federal question. (*See* Not. of Removal, filed March 21, 2002, ¶ 3.) Because the remaining two causes of action arise under state law, the Court's jurisdiction over those two claims is supplemental in nature. *See* 28 U.S.C. § 1367(a).

---

**25.** Harvey has designated Ogg as an expert, and has disclosed in discovery that "Ogg will testify regarding proper procedure under [ ] § 5150 for evaluating emergency room patients, and as to the use and abuse of drug Haledon." (*See* ACMC and Lorig's Obj. Ex. A.)

**26.** In Ogg's opinion, the use of Haldol is "inappropriate" where a patient, such as Harvey, may be experiencing a cardiac problem, because Haldol causes "hemodynamic fluctuations." (*See* Ogg Decl. at ¶ 5.)

A district court may decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." *See* 28 U.S.C. § 1367(c)(3). Where a district court has granted summary judgment on the sole federal claim, the district court, pursuant to § 1367(c)(3), may properly decline to exercise supplemental jurisdiction over the remaining state law claims. *See Bryant v. Adventist Health System/West,* 289 F.3d 1162, 1169 (9th Cir.2002).

Additionally, a district court may decline to exercise supplemental jurisdiction over a claim that "raises a novel or complex issue of State law." *See* 28 U.S.C. § 1367(c)(1). Here, the County argues that violations of the LPS Act do not give rise to a private cause of action.[27] Neither party cites authority bearing on this issue, and the Court has located one. Consequently, it would appear that the Second Cause of Action raises a novel issue of California law.

Accordingly, the Court will exercise its discretion to remand the Second and Third Causes of Action pursuant to § 1367(c)(1) and, alternatively, § 1367(c)(3).

### CONCLUSION

For the reasons stated above:

1. The motion for summary judgment filed by defendants Alameda County Medical Center and Milton Lorig is hereby GRANTED.

2. The motion for summary judgment filed by defendant Alameda County is hereby GRANTED in part; Alameda County is entitled to summary judgment on the First Cause of Action.

3. The Second and Third Causes of Action are hereby REMANDED to the Superior Court of the State of California, in and for the County of Alameda.

The Clerk shall close the file and terminate all pending motions.

**IT IS SO ORDERED.**

---

**27.** As noted, Harvey's Second Cause of Action alleges a violation of the LPS Act.